RURAL ELECTRIFICATION ADMINIS-
TRATION et al., Appellants,

v.

NORTHERN STATES POWER COM-
PANY et al., Appellees.

No. 18519.

United States Court of Appeals
Eighth Circuit.

Feb. 28, 1967.

See, also, 248 F.Supp. 616.

Harvey L. Zuckman, Atty., Dept. of Justice, Washington, D. C., for appellants. J. William Doolittle, Acting Asst. Atty. Gen., Dept. of Justice, Alan S. Rosenthal, Atty., Dept. of Justice, and Patrick J. Foley, U. S. Atty., Minneapolis, Minn., with him on the brief.

Kenneth W. Green, of O'Connor, Green, Thomas, Walters & Kelly, Minneapolis, Minn., and Cyrus A. Field, of Field, Arvesen, Donoho & Lundeen, Fergus Falls, Minn., for appellees. Kenneth W. Green, Frederick W. Thomas and Joe A. Walters, of O'Connor, Green, Thomas, Walters & Kelly, Minneapolis, Minn., Cyrus A. Field, of Field, Arvesen, Donoho & Lundeen, Fergus Falls, Minn., and Arland D. Brusven and Donald E. Nelson, Minneapolis, Minn., on the brief.

Before BLACKMUN, MEHAFFY and LAY, Circuit Judges.

LAY, Circuit Judge.

Appellees filed their complaint below to postpone and restrain the Rural Electrification Administrator from disbursing proceeds of a loan with the East River Electric Power Cooperative, Inc. The loan by the REA is pursuant to § 4 of 7 U.S.C. § 904, and constitutes a 5.9 Million Dollar long-term loan for the construction of transmission facilities in Minnesota and South Dakota. The complaint is to compel the Administrator to perform a duty owed to the appellees pursuant to certain regulations promul-

gated by the Administrator in handling the loans.[1]

Appellants filed a motion to dismiss which was heard contemporaneously with appellees' motion for preliminary restraining order as to the consummation of the loan. The lower court denied the motion to dismiss. The preliminary injunction was denied because of the failure of plaintiffs to establish "the requisite reasonable certainty or substantial likelihood of success on the merits so as to justify preliminary injunctive relief." The trial court stated:

"In contrast to plaintiffs' allegations concerning disregard of the procedural requirements of Bulletin 111–3, considerable evidence indicates that defendants have indeed proceeded in accordance with the regulations."[2] Northern States Power Co. v. Rural Electrification Admin., D.Minn. 1965, 248 F.Supp. 616, 625.

Subsequently, appellees moved for production of certain documents and correspondence regarding the negotiations leading up to the present loan. The REA claimed executive privilege by Secretary of Agriculture, Orville Freeman, and the Administrator to the various documents. The court granted an *in camera* order requiring the government to produce the documents to enable the court to examine them to determine validity of the claim. Thereafter, the appellants moved to amend the *in camera* order to require the court, in the event that their claim of privilege was overruled, to return the documents so that they might determine whether to stand on their claim of privilege. The trial court properly, we think, refused such an order. Thereafter, appellants filed notice asserting the executive privilege and their announced refusal to obey the court's order concerning the *in camera* production. On June 17, 1966, the appellees by their attorneys, moved pursuant to Rule 37(b) (2) for certain sanctions and again for a preliminary injunction. Pursuant to said motion and based upon the refusal of the appellants to produce the various documents, the court entered an order finding certain "designated facts" to be taken as true for the purposes of the action. These established facts are generally composed of the allegations of the complaint. The court also found "the requisite factual showing for preliminary injunction relief * * * is now apparent," and entered an order enjoining the defendants and anyone under their control from consummating or participating in the loan to East River or in distributing any portion of said loan. Appellants filed the present appeal from the latter order.

The relationship of the parties is significant. Northern States Power Company and the Otter Tail Power Company, appellees herein, are in the business of generating, transmitting and distributing electrical service within the states of Minnesota, North Dakota and South Dakota. They are known as private power suppliers. The East River Electric Power Cooperative, Inc., organized under the Electric Cooperative Act of the State of South Dakota, is engaged in the business of the transmission of electric service. It does not own any generating facilities. Appellees have for many years been contractual wheeling agents for the Bureau of Reclamation of the Department of Interior, and provide transmission service to various cooperatives. They also supply electrical energy to various borrowers under the Rural Electrification Act. East River purchases its power supply from the Bureau of Reclamation and delivers the electrical energy over its own transmission system to its South Dakota members. The power supply purchased from the Bureau of Reclamation to East River's Minnesota mem-

1. Appellee alleges jurisdiction under the following:
    (1) 28 U.S.C. § 1361 (Mandamus)
    (2) 5 U.S.C. § 1009 (Adm.Proc.Act)
    (3) 28 U.S.C. § 2201 (Declaratory Judgments)
    (4) 28 U.S.C. § 1331, § 1391 (Federal Question)

2. See n. 24, infra.

bers is presently being transmitted by the appellees to delivery points in Minnesota. In May, 1964, East River applied for a loan with REA to construct its own transmission lines for service to its Minnesota members.

### The Complaint

Summary of the plaintiffs' complaint and the particular regulations is essential to a full understanding of the problems involved:

A. Complaint is filed to *postpone* * * * actions, for a declaration that such actions are *in violation of law;* to *restrain* REA from disbursing loan; to *compel* Administrator to perform a duty *owed* to the plaintiffs.

B. Pursuant to statute (7 U.S.C.A. § 901) Administrator of REA is *empowered* to make loans to cooperative associations for construction and operation of generating plants and transmission lines for furnishing of electrical energy to persons in rural areas who are not receiving central station service. *Loans made by REA are funds from Congress made available to certain terms under annual appropriation acts.*

C. In 1963 Congress created duties and rights of private power suppliers by directing the Administrator to promulgate regulations "REA Bulletin 111–3" duly published in Fed.Register (Vol. 29, No. 40, pp. 2765–6) requiring the Administrator, in connection with any loan, to:

(1) make power survey and determine wherein the proposed contract for power is unreasonable;

(2) advise the supplier wherein such contract is unreasonable; and

(3) endeavor to get such contract modified to make it reasonable.

No loan is to be made unless a reasonable contract cannot be obtained.[3]

D. On May 26, 1964, East River made application for loan to be used for construction of independent transmission lines, including transmission system for service to Minnesota members.

E. Administrator undertook *power supply survey* and requested plaintiffs and East River to consider, discuss and negotiate long-term arrangement

---

3. A summary of the regulations (REA Bulletin 111–3) 29 Fed.Reg. 2765–6, demonstrates first a general policy statement regarding loans:
 A. To seek more advantageous power supply arrangements to accomplish objectives of REA.
 B. To conserve REA loan funds.
 C. Surveys to assure review and closer cooperation between REA and electrical power suppliers.
 (1) Power supply surveys:
 (a) Borrower can request power supply survey.
 (b) Conduct of survey—*if* Administrator determines to undertake it, adequate review of *applicants* power supply problems and needs must be made. Where Administrator finds proposed contracts with power suppliers unreasonable for purposes of REA, *the supplier will be advised wherein they are unreasonable,* and the REA will *endeavor* to have the contracts made *reasonable.* Borrower should be made a party to such negotiations. When *necessary,* the Administrator shall advise the parties *of a definite time lim-*

it *for negotiations* under survey and *a final cut-off date* for all proposals *which are to be considered in EVALUATION* of loan applications related to the problems and needs covered by the survey.
 (c) No loans will be made until a power supply survey has been completed.
 (d) Certification is required by Administrator of loans for generation or transmission facilities to Secretary of Agriculture that the loan is needed based upon the power supply survey which shows . . . proposed contracts to provide facilities to be financed were *found* to be unreasonable, *each supplier was so advised, REA attempted to make contracts reasonable,* and the proposed suppliers failed to do so in the *time set by Administrator.* If the loan is for more than $2,000,000 certification must also be made to the Comptroller General, Senate and House of Representatives with specified detailed information furnished. As to the specifics required, see n. 17. infra.

for power supply to East River members:

(1) A conference was held on June 11, 1964, by representatives of all parties;

(2) Proposal for "Joint Plan" sent to East River on July 9, 1964, rejected by East River on July 27, 1964;

(3) On August 3, 1964, REA states proposal must meet certain requirements and submit final plan by October 5, 1964;

(4) Plaintiffs submitted its proposed plan on October 2, 1964;

(5) May 17, 1965, notification by REA that proposals were not satisfactory and loan to East River would proceed.[4]

**4.** For reasons which will become apparent, we set forth the Administrator's letter, offered below as "Exhibit O."

"This letter is to advise that REA has just completed a long and careful study of the various plans proposed and available for delivery of power by East River Electric Power Cooperative to its member distribution cooperatives in Minnesota. This study has included a comprehensive review of both the straight wheeling proposals offered by Northern States Power Company and Otter Tail Power Company for delivery to the distribution cooperatives over wholly owned company facilities and the final offer of Northern States Power Company and Otter Tail Power Company as set forth in your letter of October 2, 1964, for delivery of power to East River's Minnesota members over company owned transmission lines in exchange for the construction by East River of facilities in South Dakota beneficial to the companies.

"As you may agree, our analysis has extended over a considerable period of time because of the long history of correspondence, meetings, negotiations and studies concerning the power supply problems of the East River Electric Power Cooperative in Minnesota. These ranged from the discussion in March 1963 to the final offer of Northern States Power Company and Otter Tail Power Company, dated October 2, 1964, and East River's own application for funds for an independent transmission system. However, as you may recall from our telephone discussion in late December 1964, I advised that the REA analysis of your final proposal of October 2, 1964, would require more time than we had first anticipated. Because of this delay your telegram of December 30, 1964, which confirmed that the existing wheeling rates would be kept in effect for any period desired by East River was greatly appreciated.

"We have advised previously that the straight power wheeling arrangement now in effect results in higher costs to East River than those under other alternatives available including independent construction. Your final offer of October 2, 1964, has now been completely analyzed in all its aspects and indicates only very marginal annual economic benefits based on normal REA estimates and forecasts. However this offer also involves the disadvantages of higher initial investment required, the possibility of increased costs to East River which could develop under the proposed arrangement over which neither the cooperative nor companies would have control, and a lack of flexibility by which East River might take advantage of possible future beneficial joint arrangements with your companies, the U. S. Bureau of Reclamation, the Missouri Basin Systems Group, or others.

"Because the marginal economic benefits indicated in your final offer do not seem to compensate for the restrictions involved, including the sacrifice of possible future advantageous cost saving arrangements by East River, and in view of the fact that certain likely developments could offset even the marginal benefits, we have decided to proceed with consideration of the plan for East River to provide power deliveries to its two member cooperatives in Minnesota by means of the planned independent facility arrangement. Considering the above, as supported by our studies, we believe that it would be unreasonable to commit East River to either of the offered alternatives.

"We would like to emphasize that even though REA should make a loan to East River for transmission facilities in Southwest Minnesota, such loan will not preclude any subsequent arrangements the companies and East River may desire to negotiate in the future pertaining to specific power delivery requirements. We sincerely think you and Mr. Nye for your good cooperation in the long negotiation

F. Plaintiffs complied with basic requirements and with all basic suggestions made in August. Plaintiffs are ready, willing and able to provide services and to resolve all questions concerning the proposed contract.

G. *Defendants failed and refused to*

(1) *advise plaintiffs wherein their proposal of October 2, 1964, was unreasonable or deficient;*

(2) *endeavor to have the proposal made reasonable* or the deficiencies corrected. The failure and refusal constitutes:

(a) a willful violation of Rea regulations;

(b) an unlawful failure to perform duty owed to plaintiffs, and

(c) a denial of plaintiffs' rights.

H. Defendants arbitrarily set a cut-off date for negotiations and prejudged the loan substituting East River's judgment for their own.[5]

I. Reasons for rejection were not communicated to plaintiffs.

J. Purported certifications were arbitrary and capricious and in excess of statutory authority and were without observance of procedural requirements.

As a result thereof, appellees have incurred damages in the sum of $1,-000,000. Appellees pray to enjoin loan pending performance of duty to effectuate a reasonable contract by advising in writing of deficiencies and unreasonableness of their proposal of October 2, 1964; and endeavor with "deliberate speed" to make the proposed contract reasonable, if at all possible; and otherwise comply with regulations.

## The Regulations

■ We are in accord with the trial court's analysis as to the legal effect of regulations promulgated by the administrator. Congress undoubtedly intended that the Administrator's regulations be followed, whether they speak only of internal policy or not. See Columbia Broadcasting System v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563.[6] However it does not necessarily follow, as the trial court has assumed, that the legal status of the regulations necessarily permits review by the appellees herein.[7] In Schilling v. Rogers, 363

and exploration of alternative methods of delivery of power to East River's member systems."
The Administrator expanded these reasons in a requested letter by the Senate Appropriations Committee on June 21, 1965. See n. 20, infra.

5. The complaint reads:
"*The defendants failed to find that a reasonable contract could not be obtained with plaintiffs, and any purported finding that a reasonable contract cannot be obtained is without evidence to support it.*"
The trial court made a finding to this effect under appellees' motion pursuant to Rule 37(b) (2).

6. In the *Columbia Broadcasting System* case, Chief Justice Stone said:
"The Commission argues that since its Report characterized the regulations as announcements of policy, the order promulgating them is no more subject to review than a press release similarly announcing its policy. Undoubtedly regulations adopted in the exercise of the administrative rulemaking power, like laws enacted by legislatures, embody announcements of policy. But they may be something more. When, as here, the regulations are avowedly adopted in the exercise of that power, couched in terms of command and accompanied by an announcement of the Commission that the policy is one 'which we will follow in exercising our licensing power,' they must be taken by those entitled to rely upon them as what they purport to be—an exercise of the delegated legislative power—which, until amended, are controlling alike upon the Commission and all others *whose rights* may be affected by the Commission's execution of them. The Commission's contention that the regulations are no more reviewable than a press release is hardly reconcilable with its own recognition that the regulations afford legal basis for cancellation of the license of a station if it renews its contract with appellant." 316 U.S. at 422, 62 S.Ct. at 1202.

7. This is the same error pursued by the District Court in Schuetzle v. Duba, 201 F.Supp. 754, at 758, reversed by this court in 303 F.2d 570.

U.S. 666, 80 S.Ct. 1288, 4 L.Ed.2d 1478, the Supreme Court in reviewing *statutory* restrictions on the Custodian under The Trading With the Enemy Act stated:

" * * * we think the congressional decision to spell out in some detail certain limitations on the power it was conferring on the Executive was not designed to bestow rights on claimants, arising out of an assertedly too-narrow reading by the Executive of the discretionary power given him. Rather we consider the specifications * * * as designed to provide guides for the Executive, thereby lessening the administrative burden of decision. * * * "

A. *Standing* by "public interest".

■ Although concepts of standing, judicial reviewability and justiciable controversy are intermingled in the area of administrative review, our analyses compels reversal under any or all of these jurisdictional bases. Appellees' brief well demonstrates isolated statements and cases dealing with agency review are not all simply reconciled.[8] However, distinguishing factors become readily apparent in review of the myriad of cases.

■ The Rural Electrification Administration's powers are all exercised by the Administrator under the supervision of the Secretary of Agriculture. 7 U.S.C. § 901. The Administrator, in §§ 902 and 904, is "authorized and empowered to make loans" for the development of rural areas deficient in rural electrification. Under the same or similar statutory authority appellees readily recognize that the interest of the economic competitor is not sufficient standing to challenge the authority or discretion of the Administrator to make loans. Alabama Power Company v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374; Tennessee Electric Power Co. v. T. V. A., 306 U. S. 118, 59 S.Ct. 366, 83 L.Ed. 543; Duke Power Co. v. Greenwood, 302 U.S. 485, 58 S.Ct. 306, 82 L.Ed. 381; Kansas City Power & Light Co. v. McKay, 96 U.S. App.D.C. 273, 225 F.2d 924, cert. den. 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780; Rural Electrification Administration v. Central Louisiana Electric Co., 5 Cir., 354 F.2d 859; Alabama Power Co. v. Alabama Electric Coop., Inc., M.D.Ala.N.D., 1965, 249 F.Supp. 855. Nor did passage of the Administrative Procedure Act create legal rights which otherwise did not exist.[9]

---

8. Perhaps the most realistic balance to judicial review as to administrative conduct even under the Administrative Procedure Act, is found in Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 301, 64 S.Ct. 95, 97, 88 L.Ed. 61, a pre-APA case: "Generalizations as to when judicial review of administrative action may or may not be obtained are of course hazardous. Where Congress has not expressly authorized judicial review, the *type of· problem involved* and the *history of the statute in question* become highly relevant in determining whether judicial review may be nonetheless supplied." (Our emphasis).

9. As this court pointed out in Duba v. Schuetzle, 303 F.2d 570, at 574: "It has also been judicially determined that the Administrative Procedure Act was not designed to and in fact has not changed the basic principle that one must have suffered a *legal wrong* in order to have standing to challenge programs administered by governmental agencies. The scope of

review under § 10(a) of the Act, 5 U.S.C.A. § 1009(a) was reviewed and considered at length in Kansas City Power & Light Company v. McKay, 96 U.S.App.D.C. 273, 225 F.2d 924, cert. den. 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780, where private electric power companies sought to enjoin federal officers and agencies from carrying out a federally supported power program, alleging loss from unlawful competition from Government contracts. The court, at pages 932, 933, of 225 F.2d, considered the history of the Act, observing that in the view of the attorney general, § 10(a) preserved the rules developed by the courts in such cases as Alabama Power Co. v. Ickes, supra, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374; Commonwealth of Massachusetts v. Mellon, supra, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078; Perkins v. Lukens Steel Co., supra, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108, and ruled that plaintiff companies gained no standing to sue by reason of the Act. See also Ove Gustavsson Con-

■■ The Supreme Court has long recognized that an "enforceable right" must be more than "a common concern for obedience to law." Singer & Sons v. Union Pac. R. R. Co., 311 U.S. 295 at 304, 61 S.Ct. 254 at 258, 85 L.Ed. 198. Nor is standing given to the appellees as representing "the public interest" analogous to F. C. C. v. Sanders Brothers Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869. Some interpretations of *Sanders* make the area confusing and more complicated. See e. g., American President Lines v. Federal Maritime Board, D.C.D.C., 112 F.Supp. 346.[10] The theory of *Sanders* is extended in Associated Industries of New York State v. Ickes, 2 Cir., 134 F.2d 694, which allows review of any administrative order when the "public interest" is being represented by any person "aggrieved," acting as "a private Attorney General." Of course, the concern of the public *is* involved when a regulatory 'charter is being granted or denied by some administrative agency. Scripps-Howard Radio, Inc. v. F. C. C., 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229. Thus, "when an existing *licensee* offers to prove that the economic effect of another station would be detrimental to the public interest" the court will review. See Carroll Broadcasting Co. v. F. C. C., 103 U.S.App.D.C. 346,

258 F.2d 440, 443, followed recently in Southwestern Operating Co. v. F. C. C., 1965, 122 U.S.App.D.C. 137, 351 F.2d 834. See also Panhandle Eastern Pipeline Co. v. F. P. C., 83 U.S.App.D.C. 297, 169 F.2d 881 [existing natural gas supplier has standing to challenge certification of competitor]. Cf. Webster Groves Trust Co. v. Saxon, 8 Cir., Dec. 14, 1966, 370 F.2d 381. Any claim of representation of "public interest" by appellees herein is found in their abbreviated reliance on Western Pac. Calif. R. R. v. Southern Pac. R. R., 284 U.S. 47, 52 S.Ct. 56, 76 L.Ed. 160, and Texas & Pac. Ry. v. Gulf C. & S. F. Ry., 270 U.S. 266, 46 S.Ct. 263, 70 L.Ed. 578. However, the agency conduct in those cases is too remote from the instant facts. The decisions in *Alabama Power* and T. V. A., both decided subsequent to the *Western Pac.* and *Texas & Pac.* cases deny that standing is derivative from "public interest" in federally supported programs involving public utilities.

B. *Standing* by "regulation."

■ Elsewhere in their briefs appellees insist that "freedom from competition is not the basic issue here" but in fact their complaint is one of individual injury by reason of "unfair treatment" by the Administrator's noncompliance

tracting Company v. Floete, 2 Cir., 278 F.2d 912, 914, cert. den. 364 U.S. 894, 81 S.Ct. 225, 5 L.Ed.2d 188."
See Jaffe, The Right to Judicial Review II, 71 Harv.L.Rev. 769 at 790, "The Administrative Procedure Act has had a negligible effect on the basic right to judicial review. * * *" See also Braude v. Wirtz, 9 Cir. 1965, 350 F.2d 702, at 707, where the court pointed out, to support standing to sue under § 10 (a) of the Act it is not enough for appellants to show that they have been "adversely affected or aggrieved." In addition, there must be a showing of adverse effect or aggrievement under "a relevant statute." In the *Braude* case a regulation promulgated by the Administrator of the Bureau of Employment Security was claimed to have been violated. The court refused review, since appellees could show no *legal wrong*.

10. Appellees reliance upon the American President Lines v. Federal Maritime

Board is misplaced. Argument was therein made that the doctrine of Alabama Power Co. v. Ickes, supra, is not applicable to proceedings under the Administrative Procedure Act. This case is disapproved in its own circuit, Kansas City Power & Light Co. v. McKay, 225 F.2d 924, at 932. This viewpoint is not shared by others: Joint Anti-Fascist Committee v. McGrath, 341 U.S. 123, at 152–153, 71 S.Ct. 624, 95 L.Ed. 817 (concurring opinion); Duba v. Schuetzle, 303 F.2d 570; REA v. Central La. Elec. Co., supra; Berry v. Housing and Home Financing Agency, 2 Cir. 1965, 340 F.2d 939; Pennsylvania R. Co. v. Dillon, 1964, 118 U.S.App.D.C. 257, 335 F.2d 292; Pittsburg Hotels Assoc. v. Urban Redevelopment Auth., 3 Cir., 309 F.2d 186; Harrison Halsted Commun. Group, Inc. v. Housing and Home Finance Agency, 7 Cir., 310 F.2d 99, cert. den. 373 U.S. 914, 83 S.Ct. 1297, 10 L.Ed.2d 414.

with his own regulations.[11] Appellees claim that *Alabama Power, Kansas City Power,* and *T. V. A.* are distinguishable since the regulations were not promulgated at the time of these decisions.[12]

Therefore, we are instructed that we must search the regulations to determine whether appellees have any legally enforceable rights to give standing to sue. The language of the bulletin sets forth the procedure that is to be followed by the Administrator in conducting a survey to consider a *borrower's* loan application. The *power supplier* has *no enforceable right* or *privilege* to obtain a contract or to otherwise have its proposal accepted.[13] The regulation states the Administrator will *endeavor* to make the proposals of the suppliers reasonable within a definite period of time.[14] If ap-

---

11. Appellees state:
"* * * this action is one to compel the performance of a duty in compliance with regulation, and not one to influence the ultimate decision of the agency. The case seeks compliance with law and regulation, not control of discretion." (Appellees' Brief, p. 49).

12. Appellees reliance on the language of the *Kansas City Power* case, suggesting standing where "regulatory action" by the government is involved is ineffective. The "regulatory action" to which reference is made, concerns "situations" such as *Sanders* under the F.T.C. or any other administrative body regulating rates, licenses, charters, et al. Appellees distinguish the *Cleco* case, 5 Cir., 354 F.2d 854, since it dealt with the regulations only collaterally.

Actually the Fifth Circuit was faced with the identical regulations and arguments as in the instant case. The court therein briefly disposed of the regulations without the apparent difficulty that we have encountered. It is true there were additional claims raised in the complaint, i. e., violation of Antitrust Law, illegal competition and constitutional claims under the Fifth Amendment. However, appellants' petition for certiorari, denied on November 21, 1966, 385 U.S. 964, 87 S.Ct. 388, 17 L.Ed.2d 309, clearly relies on the same procedural deficiencies arising under Bulletin 111-3, as appellees claim here. We agree with the Fifth Circuit's holding that appellees there, as here, have no standing to sue.

13. We do not overlook appellees' reliance on Gonzalez v. Freeman, 118 U.S.App. D.C. 180, 334 F.2d 570. There the Administrator took direct action against appellants, depriving them of eligibility for government contracts. The court said, "appellants have a right not to be debarred except in an authorized and procedurally fair manner." 334 F.2d at 576. See also Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 and United States ex rel. Accardi v. Shaugh-

nessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681, where direct administrative action against Service and Accardi was prohibited without following the applicable procedural safeguards.

The distinction between those cases and the instant one is readily apparent. The action of the Administrator in this case is to effect a loan consistent with the policy of the Rural Electrification Act and does not operate to deprive appellees of any rights. As was stated in the *Cleco* case: "Service and Accardi had a direct justiciable interest in what was about to happen directly and specifically to personal rights guaranteed by law. * * * Appellees are not being *granted* or *denied* a loan in violation of the law or in violation of regulations having the force of law." 354 F.2d at 865.

14. The appellees in their complaint request the court to order defendants to "perform the duty owed to plaintiffs" by "advising" them of deficiencies in their October 2, 1964, proposal and to "endeavor" to make them reasonable "if at all possible." Their alleged authority is 28 U.S.C.A. § 1361, which reads:

"The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

This statute, which was passed in 1962 largely to extend the remedy to courts outside the District of Columbia, "did not enlarge the scope of mandamus relief." Prairie Band of Pottawatomie Tribe of Indians v. Udall, 10 Cir., 355 F.2d 364, 367; Smith v. United States, 10 Cir., 333 F.2d 70, 72. Traditionally, mandamus is used to compel the performance of a ministerial duty or to compel the exercise of discretion when such is required, but never to influence that discretion. Wilbur v. United States, ex rel. Kadrie, 281 U.S. 206, 50 S.Ct. 320, 74 L.Ed. 809; United States ex rel. McLennan v. Wilbur, 283 U.S. 414, 51 S.Ct.

pellees' position is correct, short of obtaining a determination of "reasonable," they could always cite the Administrator as failing to "endeavor" to make the proposals reasonable. The regulations say the Administrator will inform the suppliers of the deficiencies. But the regulation does not give the supplier the *unconditional* right to have its proposal accepted. On the contrary, these requirements are designed to place sufficient information in the hands of the Administrator in order that it *"be considered in evaluation* of loan applications related to the problems and needs covered by the survey."

Appellees contend they have standing since they belong to a special class which is the intended beneficiary of the regulations promulgated by the Administrator. See Kentucky Utilities Co. v. T. V. A., 6 Cir., 375 F.2d 403, decided November 15, 1966. They claim the objectives of

the regulations are to protect the rights of the private power suppliers. We would agree with the general proposition that Congress through the REA is not interested in using governmental power to supplant private enterprise. See H.R. Rep. No. 423, 89th Cong., 1st Sess. 33 (Sen. Holland). However, such an expression of policy in and of itself does not grant a legally enforceable right in the utility to maintain it. Tennessee Electric Power Co. v. T. V. A., 306 U.S. 118, at 141, 59 S.Ct. 366. The authority of the REA to grant loans to electrical cooperatives could otherwise be thwarted. As the House Committee on Appropriations said, the right to make loans for generating and transmission purposes is deemed "absolutely essential to enable REA coops to obtain reasonable contracts with private suppliers with regard to rates, terms and conditions." H.R.Rep. No. 355, 88th Cong., 1st Sess. 7, (1963).[15]

---

502, 75 L.Ed. 1148; Work v. United States ex rel. Rives, 267 U.S. 175, 45 S.Ct. 252, 69 L.Ed. 561. Compare 1962 U.S.Code, Congressional and Administrative News, p. 2785. Moreover, the duty must be plainly defined in the terms of the applicable law. In explaining the mandamus remedy the court in Panama Canal Co. v. Grace Lines, Inc., 356 U.S. 309, 317–318, 78 S.Ct. 752, 757, 2 L.Ed.2d 788, illustrated it by saying:

"But where the duty to act turns on matters of doubtful or highly debatable inference from large or loose statutory terms, the very construction of the statute is a distinct and profound exercise of discretion."

The requirement to "endeavor to have the contracts or proposals made reasonable" is certainly "loose" terminology which is highly susceptible to the Administrator's discretionary interpretation. This is especially true in view of his authority to "limit * * * negotiations" and set "a final cut-off date * * *" Insofar as appellees seek a mandamus "to direct the retraction or reversal of action already taken * * *" they must fail. See Wilbur v. United States ex rel. Kadrie, supra, 281 U.S. at 218, 50 S.Ct. at 324.

15. "* * * the requirement of a dual rate by the private supplier, whereby a higher rate is charged for increased quantities of power for the purpose of cutting off prospective customers in

areas served by co-ops, appears unjustified and is an invitation for electric cooperatives to seek generation and transmission loans." H.R.Rep. No. 355 at p. 8.

The Senate Committee on Appropriations stated:

"The success of the rural electrification program in bringing electricity to the farms and rural areas has been an outstanding development in the past quarter century. It has benefited both the rural and urban segments of the national economy. The electrification of rural areas brought to rural residents the advantages of modern living which city people had long enjoyed. Power-type equipment operated on farms has opened a vast market in manufacturing and commerce. Non-farm employment opportunities have expanded. The rapid growth in the economy has in large part developed from the contribution that REA-financed *electrification loans has brought* to the rural areas.

"During the course of the hearings this year, the committee had presented to it, as it has in the past, widely divergent views with respect to REA loans for generation and transmission facilities.

"As previously stated, this committee believes that both the rural electric cooperatives and the private power companies who furnish most of the

The announced *responsibility* of the REA in conducting the power supply survey, which is the gist of the regulation in question, is twofold: (1) to render assistance to borrowers in obtaining the "most advantageous power supply arrangement," and (2) to conserve REA funds.[16] See Bulletin 111–3, supra. The bulletin does make a general policy statement that the power supply survey "assure adequate review of existing and proposed power supply alternatives" and "encourage closer cooperation between borrowers and other electric power suppliers." However, this statement must be read in conjunction with the expressed concern of the REA that the "terms and conditions" of power supply arrangements are major and critical factors in REA borrowers ability to carry forward the rural electrification program. If anyone is the beneficiary of the regulation, it is the rural consumer of cheap but efficient electrical energy. The intent of the regulation is to assure the borrower, not the private power supplier, the "most advantageous power supply arrangement."

It is difficult to conclude that the purpose of the regulations is to provide previously nonexistent rights to the private power supplier. The federal program under the REA is specifically for the benefit of rural families to have modern and efficient electrical facilities at the lowest rates possible. The implementation of the REA program requires a pragmatic concern for both economy and facility to the borrower, as well as to the consumer. In overseeing the Act, Congress properly is concerned in the conservation of the funds involved. This discerning interest may work to the advantage of the private power supplier, but in many instances it also can result in their economic disenchantment. In administering the REA program "freedom from competition" is not a legitimate end of the legislation or the regulations promulgated thereunder. More appropriately, we feel the responsibilities under the regulation are as set forth in its preamble. The language and the legislative background of the regulation makes it apparent that Congress was merely seeking a more effective means to police the REA loans.[17] Under such circumstances we find Congress did not intend to create any legally enforceable rights for the private power supplier.

supply of energy needed to serve the electric cooperatives are here to stay and they should make every effort to enter into earnest negotiations in reaching power supply contracts because it is to the mutual advantage of the cooperatives and the private companies to enter into satisfactory power supply arrangements." S.Rep. No. 497, 88th Cong. 1st Sess. 27 (1963).

16. Even prior to the passage of this Bulletin, REA Bulletin 20–6 was in existence having been promulgated by the Administrator May 31, 1961. This particular bulletin is made expressly applicable to all loans at the present time by its incorporation within Bulletin 111–3. This original bulletin requires the Administrator to make a predicate finding to any loan that (1) no adequate and dependable source of power was otherwise available, (2) rates charged to a consumer were higher by private suppliers than by cooperatives, and (3) that the generating and transmitting facilities were necessary to protect the security and effectiveness of the REA finance system.

17. Bulletin 111–3, as promulgated by the Administrator additionally requires the following detailed information on all loans certified by the Administrator to be furnished the Secretary of Agriculture, the Comptroller General, the Senate and the House:

1. The name and address of the applicant borrower and the date of the application.

2. Description and estimated cost of the proposed generation facilities. Indicate if the proposed facilities are the initial or additional unit or units of a plant comprised of one or more units.

3. Description and estimated cost of proposed transmission facilities, including any immediate or future plans to interconnect with other transmission systems.

4. Description of any long-range plans the applicant may have for construction of additional generation and transmission facilities and the estimated cost of the planned facilities.

5. Comparison of the estimated costs of generation by the applicant borrower with the cost of power available from

## Lack of Judicial Reviewability

■ However, notwithstanding appellees' claim to certain benefits under the regulations, they have otherwise failed to state a "justiciable controversy." [18] Their complaint relates to a phase of an incomplete process of the exercise of administrative discretion. The agency conduct does not invoke any final or adjudicatory order or process which legally wrongs appellees. Every step delineates an investigative stage directed toward accumulation of factual material for the Administrator's expertise evaluation. [19] The ultimate authorization of the loan, which appellees really want to prevent, does not and cannot involve a legal wrong to appellees.

It is patent the judicial action sought by appellees is still subject to subsequent revisory executive or legislative action. [20]

existing suppliers, including the final offer by the private supplier including terms and conditions he offered to meet applicant's long-term energy needs.

6. Summary of the efforts made by the applicant and by REA to obtain the applicant's power and energy requirements from existing power suppliers and the reasons why such efforts have not been successful.

7. Explanation of the applicant's reasons for seeking an REA loan.

8. The amount of electric energy which the applicant will cease to purchase from present power suppliers upon construction of the generating plant for which REA financing is being sought.

9. Explanation of the extent to which the feasbility of the requested loan for generation and transmission facilities depends upon the use of a portion of the facilities by others (including Federal power marketing agencies).

10. Details of the applicant's plans to sell or otherwise make available any of the power and energy from the proposed generation facilities to others (including Federal power marketing agencies).

11. Names of State agencies and commissions having jurisdiction over the applicant borrowers.

Senator Holland refers to the above as a "review program." See Senate Committee Hearings, H.R. 14596, 987–8, infra, n. 28.

18. Joint Anti-fascist Committee v. McGrath, 341 U.S. 123, at 150, 71 S.Ct. 624, at 637 Mr. Justice Frankfurter (concurring opinion) said:

"* * * The jurisdiction of the federal courts can be invoked only under circumstances which to the expert feel of lawyers constitute a 'case or controversy.' The scope and consequences of the review with which the judiciary is entrusted over executive and legislative action require us to observe these bounds fastidiously."

19. Mr. Justice Brandeis in denying a review of an order under the Valuations Act by the I.C.C., said:

"The so-called order here complained of is one which does not command the carrier to do, or to refrain from doing, any thing; which does not grant or withhold any authority, privilege, or license; which does not extend or abridge any power or facility; which does not subject the carrier to any liability, civil or criminal; which does not change the carrier's existing or future status or condition; which does not determine any right or obligation. This so-called order is merely the formal record of conclusions reached after a study of data collected in the course of extensive research conducted by the Commission, through its employees. It is the exercise solely of the function of investigation. Compare Smith v. Interstate Commerce Commission, 245 U.S. 33 [38 S.Ct. 30, 62 L.Ed. 135] *Moreover, the investigation made was not a step in a pending proceeding, in which an order of the character of those held to be judicially reviewable could be entered later."* (Our emphasis) United States v. Los Angeles & Salt Lake R. R. Co., 273 U.S. 299, at 309–310, 47 S.Ct. 413, at 414, 71 L.Ed. 651.

20. Reviewing the Administrator's reaction to appellees' claims in the Congressional hearing, any court enforced renegotiation, be it possible, would in all likelihood not change the Administrator's positive attitude of decision. Immediately before appellees filed the present suit, April–June 1965), the Senate Subcommittee on Agricultural Appropriations held hearings on the East River loan, reviewing the Administrator's certification of the loan to Congress. See notes 21 and 28 infra. Mr. Clapp, Administrator of the REA, testified at the hearings concerning appellees proposals and said in part:

"The reasons we regarded the proposal as unreasonable are those that I have stated here this morning. It tied the hands of East River and prevented it from taking advantage of pos-

Appellees attack the negotiation stages only. These lead up to (1) a finding of reasonableness or unreasonableness of the supplier's proposal, (2) evaluation of all proposals for further consideration of the borrower's loan application, (3) certification of approval of the loan to the Secretary of Agriculture, the Comptroller General, the House of Representatives and the United States Senate.[21]

See Bulletin 111-3, supra. See Jaffe, Judicial Control of Administrative Action, 100-3, supra. Even then the Secretary of Agriculture must ultimately approve and request the Secretary of the Treasury to loan the money to the Administrator, 7 U.S.C. § 903. Appellees concede in their brief, as well as in oral argument before the court, they are not attacking the certification, see n. 11, supra.[22] It is clear that appellees are at-

sible future economies in its operations which would be available to it under the independent system; it foreclosed certain possible incidental revenues which might be available to it under the independent transmission approach.

"In view of the small difference between the two plans costwise to begin with, we felt that the prudent approach was to make the smaller loan and take advantage or make it possible for East River to take advantages of this flexibility which it provided, and that it would be unreasonable to foreclose East River from doing so."

Hearings on Agricultural Appropriations, 1966, before a Subcommittee of the Senate Committee on Appropriations, 89th Cong., 1st Sess., H.R. 8370, pt. 2, at 497 (1965). See also the Administrator's letter of June 21, 1965, to the Subcommittee setting forth additional explanations, commencing at 676.

As Professor Jaffe points out, even where standing otherwise exists, as in Accardi, supra, et al., "on remand the agency often issues the same order stricken out in the requisite garb." Jaffee, Judicial Control of Administrative Action, 103, 589 (Little, Brown & Co. 1965).

21. The Congressional Committee theoretically is still reviewing this certification. See n. 20, supra. Senator Holland wrote the Comptroller General on August 18, 1965, six days after commencement of this litigation:

"During the hearings this year, the attention of the Committee was directed to the loan announced on May 24, 1965 to the East River Power Cooperative, Inc., Madison, South Dakota, for the construction of transmission facilities in the aggregate amount of $6,136,343. Committee examination resulted in conflicting testimony from the private power supplier versus that of the Administrator of the Rural Electrification Administration, and near the conclusion of the hearings

I requested that both sides—namely, the REA and the representatives of the Northern States Power Company of Minneapolis, Minnesota—submit the whole record in sufficient detail as would enable your office to make an independent evaluation. It is requested that you make a thorough examination of the cost and feasibility of each of the three transmission plans considered by the REA prior to its decision to make the loan to the East River Cooperative, and then submit your findings and evaluation to the Committee." Comp.Report 41, infra, n. 28. The loan has been submitted for review to the Comptroller General and further study by the Administrator may yet be required. Ibid.

22. This concession is undoubtedly reached from the teachings of Kansas City Power & Light Co. v. McKay, supra, 225 F. 2d at p. 931 and REA v. Central Louisiana Electric Co., supra, 354 F.2d at p. 865. In Kansas City Power case, at 931, the court said:

"* * * The statutory scheme now before us clearly contemplates Congressional, rather than judicial, review of the governmental activities here in question, all of which are non-regulatory and which include disposal of surplus electric power turned over to the SPA by the Department of the Army. Congress has reserved for itself control over such activities through the power of making annual appropriations for the executive departments affected, and by providing specifically that the contingent fund created by Section 5 of the Flood Control Act of 1944, 16 U.S.C.A. § 825s, may be expended only to the extent of annual appropriations for the purposes of the Act. The continuance of defendants' activities here complained of is therefore subject to review by Congress acting each year on the appropriations sought by the defendants. It is not—under the control-

tacking "a step in a pending proceeding" leading to an ultimate decision not otherwise "judicially reviewable." United States v. Los Angeles and S. L. R. Co., supra. Cf. Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, at 112–113, 68 S.Ct. 431, 92 L.Ed. 568.[23]

[14] Appellees submit that appellants' procedural efforts were arbitrary, capricious[24] and illegal.[25] Assuming

ling precedents—subject to review by this court."
Likewise, the Administrative Procedure Act precludes judicial review where "agency action is by law committed to agency discretion." 5 U.S.C. § 1009.

23. In Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 68 S.Ct. 431, the Supreme Court held that the provision of Civil Aeronautics Act authorizing judicial review of certain orders of the Board did not apply to decisions on applications for foreign air transportation since this was subject to Presidential approval. The court said:
     "Until the decision of the Board has Presidential approval, it grants no privilege and denies no right. It can give nothing and can take nothing away from the applicant or a competitor. * * * [A]dministrative orders are not reviewable unless and until they impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process." 333 U.S. at 112–113, 68 S.Ct. at 437.

24. The mere allegation that administrative action is "arbitrary and capricious" is not controlling. These conclusory statements are further controlled by study of the agency involved and the conduct *factually* alleged in the complaint. See Schilling v. Rogers, 363 U.S. 666, at 676, 80 S.Ct. 1288.
     Assuming the present controversy was appropriate for judicial review, even on the abbreviated record before us appellees' position would be difficult to sustain under any standards suggested. Appellees insist that its case is not to influence the discretion of the Administrator but only to be given the right (1) to be advised, and (2) to have the Administrator endeavor to make the proposal reasonable. However, on the basis of the evidence and facts pleaded by appellees there is substantial evidence to support: (1) that the Administrator did advise appellees wherein their proposal was unreasonable (see ¶ E[3] of the complaint summary, supra, p. 6) (2) did endeavor to have the proposals made reasonable (see complaint and Exhibit O, supra, n. 4). The Administrator had the right to set a cut-off date (a little

over a year after the first negotiations.) for the appellees to submit their final proposal. The cut-off date is significant. The regulations allow for it in order to avoid delaying tactics. The Administrator is not required to negotiate thereafter. An administrative interpretation of a regulation is given great weight and will not be overturned by a court unless it is clearly unsupportable. See Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 413–414, 65 S.Ct. 1215, 89 L.Ed. 1700; Fred Wolferman, Inc. v. Gustafson, 8 Cir. 1948, 169 F.2d 759, 763.
     The Administrator's evaluation obviously involves weighing extrinsic factors in consideration of the loan *vis a vis* the proposals, such as higher investment costs, flexibility, future economy and co-operation of the parties. But justification of "unreasonableness" is not the issue before us. See United States v. Carmack, 329 U.S. 230, at 243–247, 67 S.Ct. 252, 91 L.Ed. 209; Cf. Montana-Dakota Co. v. Northwestern Public Service Co., 341 U.S. 246 at 251, 71 S.Ct. 692, 95 L.Ed. 912. If we recognize this as a reviewable area under the limited rights appellees claim, we would only inquire whether the procedural steps were taken.

25. Analysis of *Alabama Power Company*, supra, forecloses consideration of plaintiffs' claim of illegality herein. The complaint in that case challenged the validity of a loan made by the Federal Emergency Administrator of Public Works to four municipal corporations for construction of an electricity-distribution system. Argument was submitted that loans were illegal because they were outside the statutory provisions. Mr. Justice Sutherland, speaking for the Supreme Court, said:
     "Can any one who will suffer injurious consequences from the lawful use of money about to be unlawfully loaned maintain a suit to enjoin the loan? An affirmative answer would produce novel and startling results. * * * Considered apart, the lender owes the sufferer no enforceable duty to refrain from making the unauthorized loan; and the borrower owes him no obligation to refrain from using the proceeds in any lawful way the ·bor-

they were, appellees cannot succeed in doing indirectly that which they concede they cannot do directly, to-wit, enjoin the loan. Congress has steadfastly refused to provide judicial review under 7 U.S.C. § 901 of the REA Act.[26] This silence could be premised on the concern that the private supplier could otherwise interfere with REA loans in each instance where the Administrator finds the public suppliers proposal unreasonable.

The studied expertise of the Administrator, the Comptroller General and Congress as to comparative cost studies, efficiency, flexibility and overall utility should remain in their capable hands and not the courts. The decisions entail engineering know-how and accounting procedures which the executive and legislative branches of government are better equipped to handle than the judiciary. The exercise of judgment by the Administrator, Congress or the Comptroller General invokes far more than perform-

ing a ministerial act. We are concerned with an area of the law "where generally the Executive and the Legislative are supreme." Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 78 S.Ct. 752; United States v. Carmack, 329 U.S. 230, 67 S.Ct. 252; United States v. George S. Bush & Co., 310 U.S. 371, 380, 60 S.Ct. 944, 84 L.Ed. 1259.[27] United States v. Wiley's Cove Ranch, 8 Cir., 295 F.2d 436; Duba v. Schuetzle, 8 Cir., 303 F.2d 570; Kansas City Power & Light Co. v. McKay, supra; R E A v. Central Louisiana Electric Co., supra. The promulgation of the regulations in question unequivocally demonstrates that the Administrator relies upon Congressional guidance and sanction. Although we doubt that Congress and the Comptroller General will desire to review every loan made by the REA they do possess the machinery and the ability for review, as in the instant case, where the parties are in good faith in attempting to reach a meeting of the minds.[28] Under the facts presented here

---

rower may choose." 302 U.S. 464, at 480, 58 S.Ct. 300, at 304.

**26.** See, e. g., Schilling v. Rogers, 363 U.S. 666, at 674, 80 S.Ct. 1288, at 1294, where Justice Harlan said:

"The point is that in this Act [Trading with the Enemy Act] Congress was advertent to the role of courts, and an absence in any specific area of any kind of provision for judicial participation strongly indicates a legislative purpose that there be no such participation * * * [citing Work v. United States ex rel. Rives, 267 U.S. 175, 182, 45 S.Ct. 252]."

In 1962 and 1963 attempts were made to introduce bills into Congress amending the Rural Electrification Act to provide for public hearings and judicial review of orders approving loans. These bills were not reported out of committee. See Hearings on Food and Agriculture Act of 1962 before House Committee on Agriculture, 87th Cong., 1st Sess., pp. 680–681. See also H.R. 6852 and H.R. 7213, 88th Cong., 1st Sess.; Hearings before House Appropriations Committee on Department of Agriculture Appropriations for 1964, 88th Cong., 1st Sess., p. 374.

**27.** Mr. Justice Douglas said:

" * * * a change of rate * * * is *no more subject to judicial review*

under this statutory scheme than if Congress itself had exercised that judgment. It has long been held that where Congress has authorized a public officer to take some specified legislative action when in his judgment that action is necessary or appropriate to carry out the policy of Congress, the judgment of the officer as to the existence of the facts calling for that action is not subject to review." 310 U.S. at 380, 60 S.Ct. at 946.

**28.** The Congressional referral to the Comptroller General to review the East River loan resulted in a recommendation that appellees' "joint plan" be further studied. See Comptroller General's Report to Agricultural Subcommittee of Senate Committee on Appropriations, Examination into Alternative Transmission Plans Considered Prior to Approval of a Loan to East River Electric Power Cooperative, Inc., Madison, South Dakota, at p. 3 (February 1966), SupplR. 165. The report discusses the merits of the "joint plan" in relation to those of the "independent plan." The Comptroller General supports the appellees plan as one which would result in "greater economics to East River."

This report alone goes far to illustrate the administrative discretion involved in the consummation of REA loans, and

notwithstanding the regulations, the character of the agency action involved falls short of presenting a justiciable controversy.

The preliminary restraining order entered on June 27, 1966, should be dissolved by the District Court and the appellees' case dismissed for lack of jurisdiction.

Reversed in accordance with the opinion.

buttresses the disrupting effect that judicial review would have upon the whole administrative process in this particular area. However, after the Senate Committee's referral to the Comptroller for study of the loan the REA made the first advance in funds to East River as of September 17, 1965. And despite the Comptroller's recommended restudy the REA had advanced funds under the loan to East River in the sum of $624,438.86 as of March 14, 1966. This occurred before the preliminary injunction of June 27, 1966. Hearings before the Agricultural Subcommittee of the Senate Committee on Appropriations, 89th Cong., 2nd · Sess., H.R. 14596, pt. 2, p. 995. Whether such judgment and agency conduct is in the best interest of the objectives of the REA, particularly in light of the Comptroller General's Report of February 1966, recommending further study, is properly a Congressional concern and not ours. Certainly, the Congressional hearing and the Comptroller's report were intended for a purpose.