**RURAL ELECTRIFICATION ADMINIS-
TRATION et al., Appellants,**

v.

**CENTRAL LOUISIANA ELECTRIC
COMPANY, Inc., et al., Appellees.**

No. 22256.

United States Court of Appeals
Fifth Circuit.

Jan. 13, 1966.

Rehearing Denied Feb. 7, 1966.

Harvey L. Zuckman, Alan S. Rosenthal, Attys., Dept. of Justice, Washington, D. C., Paul M. Hebert, Theo F. Cangelosi, John Schwab, Robert L. Cangelosi, Baton Rouge, La., John W. Douglas, Asst. Atty. Gen., Edward L. Shaheen, U. S. Atty., for appellants.

William O. Bonin, New Iberia, La., Andrew P. Carter, Eugene G. Taggart, New Orleans, La., Tom F. Phillips, Baton Rouge, La., Jacob S. Landry and William O. Bonin, Landry, Watkins, Cousin & Bonin, New Iberia, La., for appellee.

Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, La., for intervenor Gulf States Utilities Co.

Monroe & Lemann, New Orleans, La., for intervenor, Louisiana Power & Light Co.

Before BROWN and COLEMAN, Circuit Judges, and MORGAN, District Judge.

COLEMAN, Circuit Judge:

On September 12, 1964, the Rural Electrification Administration, acting by and through its Administrator, approved a loan in favor of Louisiana Electric Cooperative, Inc., in the amount of $56,521,000. Of this sum $27,079,200 was to be used in the construction of a 200,000 kilowatt steam generating plant. $28,184,000 of the proposed loan was to be used in the construction of 1611 miles of high voltage transmission lines in Louisiana and 82 miles in Arkansas. $1,257,800 was earmarked to construct other facilities. By this loan the proposed borrower would be enabled to generate, sell, and transmit electric power to various electric cooperatives presently being served by the complaining investor-owned private power companies.

The Central Louisiana Electric Company, Inc., sought injunctions both preliminary and permanent. Louisiana Power and Light Company and Gulf States Utility Company were granted leave to intervene as plaintiffs. Testimony on the part of Central Louisiana Electric Company shows that its investment in plants and facilities dedicated to customers now about to be lost amounts to 5% of its total. The annual gross income to be lost is less than 4% of the whole.

Upon due notice, and upon consideration of the verified complaint, affidavits of plaintiff and other witnesses, defendant's motion to dismiss and motion for summary judgment, defendant's response to order to show cause why preliminary injunction should not issue and affidavit in support thereof, and on testimony adduced in support of the application, after receiving briefs and argument of the parties, the district court granted the preliminary injunction. Defendants, pending the further order of the court, were restrained and enjoined from consummating the loan and "from doing any act in furtherance thereof, including, but not limited to, the execution of any agreement or undertaking in connection therewith, and the disbursement or authorization of any disbursement of any funds in connection therewith". Defendants' motions to dismiss and for summary judgment were denied.

From the granting of the preliminary injunction, defendants have appealed, contending that appellees did not have "the requisite standing to maintain the suit * * * the district court lacked jurisdiction over the subject matter of the action".

For the reasons hereinafter enumerated, we hold that the plaintiffs are without the requisite standing and the courts are without jurisdiction to review, necessitating a reversal of the judgment of the District Court.

Plaintiffs allege that on the day of the loan approval the Administrator certified to Congress that he had caused a power supply survey to be made in accordance with REA Bulletin 111–3; that, based on such survey, the approved loan is needed because existing and proposed contracts to provide facilities or service to be financed were found to be unreasonable, each supplier involved had been so advised, REA attempted to have such contracts made reasonable, and the existing or other proposed suppliers had failed or

refused to do so within the time set by the Administrator.

It is further alleged that the Administrator submitted to Congress an accompanying statement of information relative to the loan approval. It is contended that the loan approval is illegal and invalid, that the aforesaid certificate and statement of information are incorrect, and plaintiffs have thus *"suffered a legal wrong and are adversely affected or aggrieved thereby"*, entitling them to a judicial review under 5 U.S.C.A. § 1009.

*In summary*, the grounds alleged in behalf of relief were substantially as follows:

(1). The intent of Congress, as reflected by certain "directives of the House and Senate Appropriations Committees", had been violated;

(2). that on February 24, 1964, the Rural Electrification Administration published certain rules and regulations in the Federal Register (REA Bulletin 111–3) in which REA proposed to obey the directives of the Congressional Committees;

(3). the proposed loan violated the purposes of the REA Act, 7 U.S.C.A. § 904, violated the directives of the Congressional Committees, violated Bulletin 111–3, and violated complainant's constitutional rights;

(4). complainant is a privately owned public utility engaged in the business of generating, transmitting, and distributing electric energy in 25 Louisiana parishes, with a total investment of $112,968,468 in plant and facilities, with 1963 revenues of $20,774,023. It furnished wholesale electric service to six Louisiana electric cooperatives to which it had dedicated an investment of $5,615,-561. Annual receipts from this activity for the twelve months expiring August 31, 1964, amounted to $712,134 at an average cost of 6.87 mills per Kilowatt hour, "which rate is among the lowest in the nation for such service, and complainant is ready, willing and able to serve all of the present and foreseeable future requirements of said member cooperatives on an adequate and dependable basis";

(5). the super cooperative, to which it was proposed to make the loan, has no transmission or distribution facilities and does not furnish electricity to anyone. It was created for the sole purpose of selling to its own members who now buy from the complainant or other privately owned power companies;

(6). that under 7 U.S.C.A. § 901 Congress created a duty on the part of the defendants and in favor of complainants not to grant loans when existing central station service was available;

(7). that the loan is proposed in violation of the Congressional directive and the rules adopted by REA for its own governance;

(8). that the administrator took the position that existing and any proposed contract between the private power companies and the existing cooperatives would be considered unreasonable unless the companies agreed to an exclusive territorial monopoly in favor of said cooperatives;

(9). that the lowest rate at which the super cooperative could furnish electricity to its members, pursuant to the loan, would be 7.5 or 8 mills per Kilowatt hour, whereas the companies had offered lower rates;

(10). *that the loan would create an unjustifiable subsidy in favor of a direct competitor*, in violation of 7 U.S.C.A. § 904, that in this regard the approval of the loan was arbitrary and capricious, *amounting to unjust and unwarranted discrimination in favor of a competitor*, denying to complainant the equal protection of the laws and depriving it of its property without due process of law in violation of the 5th Amendment (emphasis added).

(11). the proposed loan violates 7 U.S.C.A. § 904 in that the consent of the state authority having jurisdiction had not been obtained;

(12). the super cooperative had not obtained a certificate of public convenience and necessity from either Louisiana and Arkansas, and the REA Administrator had certified that none was necessary,

thus subjecting the complainant to illegal competition;

(13). that the consent of the Federal Power Commission had not been obtained, which, again would result in illegal competition;

(14). that the super cooperative will require a thirty-five year contract with its members, which will deny to complainant a substantial portion of its market for wholesale power;

(15). that compliance with the Administrator's requirements would result in combination and conspiracy in restraint of trade; and

(16). that granting the loan would cause a violation of the anti-trust laws of the United States and the State of Louisiana, and amounts to a conspiracy to do such.

Then followed the customary prayer for injunctions, preliminary and permanent.

The district court made findings of fact substantially supporting these allegations. These findings will be set out verbatim in an appendix to this opinion.

I

■ Under Section 10(a) of the Administrative Procedure Act, 5 U.S.C.A. § 1009, it seems to be settled in a case of this kind that if Congress has failed to give an appellant standing to sue by express or implied provisions of statute * * * mere economic competition made possible by governmental action (even if allegedly illegal) does not give standing to sue to restrain such action. Pennsylvania Railroad Company v. Dillon, 1964, 118 U.S.App.D.C. 257, 335 F.2d 292, citing Tennessee Electric Power Company v. Tennessee Valley Authority, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939); Alabama Power Company v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 (1938); Kansas City Power and Light Company v. McKay, 96 U.S.App.D.C. 273, 225 F.2d 924, cert. denied, 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780 (1955); and Texas State AFL–CIO v. Kennedy, 117 U.S.

App.D.C. 343, 330 F.2d 217 (1964). On December 14, 1964, the Supreme Court denied certiorari in the Pennsylvania Railroad case sub. nom. American-Hawaiian Steamship Company v. Dillon, 379 U.S. 945, 85 S.Ct. 437, 13 L.Ed.2d 543. This was two weeks after the granting of the preliminary injunction in the instant case, which issued on December 1, 1964.

From the foregoing, we are of the opinion that the correct decision of this appeal is to be found in the answers to the following questions:

1. Does this case raise anything more than "mere economic competition made possible by governmental action"?

2. If not, has Congress, expressly or by implication, given appellees standing to sue under the terms of the Rural Electrification Act of 1936, 49 Stat. 1363, 7 U.S.C.A. § 901 et seq.?

3. Has Congress, expressly or by implication, conferred jurisdiction on the Courts to review the granting or denial of a proposed REA loan?

In view of the effort to invoke Amendment 5 of the Constitution, we add a fourth question:

Have appellees shown any legally protected property right to be free of competition from the prospective borrower?

■ In answering these questions we bear in mind (a) that this Court does not find the facts and (b) appellees must demonstrate "statutory aid to standing". Pennsylvania Railroad Company v. Dillon, supra.

II

We take the Constitutional question first.

■ It must be conceded as a fact that up until now the complaining companies have been the sole source of electric power for the REA cooperatives who would buy exclusively from the beneficiary of the loan if the loan is made. There is, however, nothing in the record

to indicate that plaintiffs are the owners of an exclusive franchise, lawfully granted, entitling them, and no others, to generate, distribute, and sell electric power in the territory involved. Indeed, the President of Central Louisiana Electric Company testified that he was unable to recall any certificates of convenience and necessity held by that company from the Public Service Commission of Louisiana. The other complaining companies made no proof of any such certificates. Granting that such certificates, if they existed, might not be exclusive, none of any kind are shown. This takes this case out of the principles announced in Whitney National Bank v. Bank of New Orleans and Trust Company, 116 U.S.App. D.C. 285, 323 F.2d 290, reversed on other grounds 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386. In that case the District of Columbia Circuit held that a duly *chartered* state bank had standing to challenge the establishment of a competing bank in violation of state law. In the Supreme Court the case went off on the point that the Federal Reserve Board had exclusive original jurisdiction. It is interesting to note, however, that the D.C. Circuit cited Alabama Power Co. v. Ickes, supra, as authority for the rule that "one who has no contractual or statutory right to be free of competition, and no property right which would be infringed thereby, has no standing to challenge federal administrative action which simply increases the amount or effectiveness of competition".

Lack of any franchise or certificate of an exclusive nature also takes this case out of the rule announced in National Bank of Detroit v. Wayne Oakland Bank, 252 F.2d 537, certiorari denied 358 U.S. 830, 79 S.Ct. 50, 3 L.Ed.2d 69, wherein the Sixth Circuit held that an exclusive banking franchise granted by state law was a valuable property right which could not be invaded by one acting under authority of the Federal Government.

■ The complaining companies are the only ones of their kind presently in the territory. Our attention has been directed to no statute or contract, however, which would entitle them to remain so, to the exclusion of all others and free of competition. Since no such right is shown to exist, then it necessarily follows that there can be no property right in that regard. It further follows that making a loan for the construction of competitive facilities is not a deprivation of property rights guaranteed by the Fifth Amendment. If the new cooperative has a right to compete then those who have heretofore purchased electric power from the complaining companies certainly have the right, if they wish, to buy from the new establishment.

■ Appellees have no doubt known all along that they did not hold exclusive franchises. Since 1936 they have known of the Rural Electrification Administration, its powers and purposes. They have made investments and conducted operations in an awareness that the Rural Electrification Administration was in business, with power to make a loan to someone to finance the construction of generators and transmission facilities. The appellees have been and are now doing business with cooperatives established and financed under the REA Act. The record shows no intention or attempt to abrogate *existing contracts* between the parties. Appellees do not have a Constitutionally guaranteed, unrestricted privilege to engage in business free of competition. Cf. Nebbia v. People of State of New York, 291 U.S. 502, at 527, 54 S.Ct. 505, 78 L.Ed. 940.

### III

■ Does the case raise anything more (in the words of Dillon) than "mere economic competition made possible by governmental action"? We think not.

Without repeating what has already been said, the proof simply shows that whereas the companies have heretofore been the sole occupants of this particular territory, they are to be replaced at some date in the future by a competitor financed under a Federal statute now near-

ly thirty years old. They are to completely lose customers which heretofore they alone had, but *this is not an unusual product of competition.*

Under the rule of Pennsylvania Railroad Company v. Dillon, supra, this eliminates from consideration the allegation of illegal acts by the REA Administrator.

## IV

From the entire history of the Rural Electrification Act and its administration we are totally convinced that Congress has never enacted or intended that loans by this Agency should be reviewable in the courts. The Act itself makes no provision for judicial loan review. By the allegations of the Complaints we are informed of the thorough manner in which Congress has ridden herd on the REA. Congressional Committees caused the promulgation of REA Bulletin 111–3, which appellees now say has been violated. Certainly, the demands of Congressional Committees do not have the force of law. Congress has seen fit not to enact these particular demands into law, evidently being most content to rely on the deadly sword constantly in its own hands, that is, the sole control of the purse out of which the loans are made. Regardless of how outrageous or unfair the making of this loan may seem, the remedy is not in the courts but in the Congress.

## V

Appellees have invited our attention to Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403. It was there held that the discharge of Service from career employment in the State Department would be set aside because the Secretary of State had not followed Regulations which he had promulgated. The opinion cited United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681, which held that Regulations promulgated by the Attorney General were binding on him. Service was losing a career service job to which he was otherwise lawfully entitled. Accardi was about to be deported without a hearing to which he was lawfully entitled. These situations were not analogous to that now before us. Service and Accardi had a direct justiciable interest in what was about to happen directly and specifically to personal rights guaranteed by law.

Appellees here are not parties to the loan. Appellees are not being *granted* or *denied* a loan in violation of the law or in violation of regulations having the force of law. They are not having any penalty or forfeiture directly assessed against them. They come into court to halt a loan to a third party, contending that the loan is being illegally made and, in the future, will cause illegal consequences. Their only standing for this is their natural opposition to having territory invaded which heretofore has been de facto their sole domain but in which they have no exclusive right.

This Court is well aware of the decisions of the Supreme Court in Alabama Power Company v. Ickes, Tennessee Power Company v. TVA, and Kansas City Power and Light Company v. McKay, cited previously in conjunction with Pennsylvania Railroad Company v. Dillon. We do not here enter into an elaborate discussion of these cases. They are duly reported and speak for themselves. Basically, of course, these cases are authority for the proposition that appellees do not have the standing to sue. Appellees, however, point to the language in Alabama Power Company v. Ickes, wherein the Court said: " * * * If conspiracy or fraud or malice or coercion were involved, a different case would be presented, but in their absence, plainly enough, the *mere* consummation of the loans and grants will not constitute an actionable wrong. * * *".

The gap here, if there be one, was filled in Pennsylvania Railroad v. Dillon, supra, on which the Supreme Court denied certiorari. It may be well to point out, however, that in the case now about to be decided the distinguished trial Judge in his conclusions of law refers only to statutory authority, illegal competition, violation of state and fed-

eral anti-trust laws, violation of 7 U.S.C.A. § 904, and conspiracy by appellants to injure appellees' business. The trial Court did not use the words "fraud, malice, or coercion", nor did it use language clearly synonymous thereto. As to conspiracy, the undisputed proof shows, beyond question, that appellants have cooperated with the borrower-applicant to make a loan which will cause serious competition. This will hurt complainants' business, as would competition from any source. In our judgment this was not what the Supreme Court had in mind when it spoke of conspiracies in the *Ickes* case. Of course, the Supreme Court did not spell this out because there was no question of conspiracy then before it. The record reflects much feeling between the parties over granting the rural cooperatives territorial integrity for their operations. Apparently, from the record, Louisiana makes no effort at regulation in this regard but leaves all such parties to fight it out, unpoliced, among themselves. No party to this litigation has any certificate of convenience and necessity from Louisiana authorities. Since the cooperatives owe money to the United States we cannot see that the Administrator is guilty of a conspiracy in the legal sense when he seeks to insure the operating solvency of the debtors, not to mention their financial ability to render reasonably effective service to their customers.

## VI

▆ We consider it completely appropriate to say that this Court has approached this case with sincere deference for the findings and views of the able and conscientious Judge who heard it in the first instance. We are nevertheless constrained to the opinion that appellees did not have the requisite standing to bring this action and neither do the Courts have jurisdiction to review the granting or denial of loans by the Rural Electrification Administration. Congress has not conferred such jurisdiction by specific language; Congressional action negates rather than implies an intent

to confer such jurisdiction. The Judgment must be reversed.

## VII

This means, of course, that the preliminary injunction is dissolved. We appreciate, however, the various considerations of public interest involved in this litigation and which received such painstaking study below. With this in mind, of our own motion, we stay our judgment in the following particulars and under the following conditions:

That part of the preliminary injunction which restrained the making and disbursing of the loan shall remain in full force and effect for such length of time as appellees may require for a timely exhaustion, if they so desire, of any remedy of review and decision available in the Supreme Court. In all other respects the preliminary injunction is immediately dissolved.

Reversed, with a partial stay as to the dissolution of the preliminary injunction.

## APPENDIX TO OPINION

### FINDINGS OF THE DISTRICT COURT IN GRANTING PRELIMINARY INJUNCTION
3.

"The requirements for consideration of a loan application under 7 U.S.C. 904 were set forth by the Administrator in REA Bulletin 111–3, 29 Federal Register 2765 (1964), and this bulletin states that no loan shall be granted except upon certification by the Administrator to the Secretary of Agriculture of the completion of a power supply survey showing that the loan is

"* * * (c) needed because existing and proposed contracts to provide the facilities or service to be financed were found to be unreasonable, each supplier was so advised, REA attempted to have such contracts made reasonable, and the existing or other proposed supplier had failed or refused to do so within the time set by the Administrator."

**4.**

"The REA Bulletin 111–3 was promulgated by the Administrator at the direction of the Appropriations Committees of the Eighty-eighth Congress, and the Bulletin was published in the Federal Register at their direction. After its publication the Administrator assured the committees that it was issued in compliance with their directives and would be followed by him in the administration of the Rural Electrification Act.

**5.**

"In approving the loan, the defendant Administrator certified that the requirements of the Bulletin had been complied with by him, and the evidence showed that, in fact, on February 13, 1964, the Administrator initiated a power supply survey pursuant to this Bulletin and notified plaintiff and other Louisiana suppliers of electricity to cooperatives that future power arrangements between them and the cooperatives must meet three requirements, namely;

1. The cooperatives must obtain power at the lowest possible cost under relatively short-term contracts;

2. The cooperatives must be assured contractually of an adequate power source and of its availability to meet future needs; and

3. Means must be found, legislatively or otherwise, to assure the territorial integrity of the cooperatives.

**6.**

"During the course of negotiations conducted between the parties, the Administrator refused to consider the reasonableness of contract proposals made by plaintiff and the other companies with respect to cost of power and conditions of availability and delivery of electricity unless the private companies first agreed to contractually assure the cooperatives of territorial integrity or immunity.

**7.**

"Upon advice of counsel, plaintiff and the other companies refused to incorporate into their power supply contract proposals provisions designed to accomplish the Administrator's territorial immunity demands. Although the Administrator admitted that the territorial requirements could not legally be incorporated into power supply contracts, he certified that the loan was approved because the existing suppliers failed to satisfy these same requirements. The plaintiff thus made a prima facie showing that the Administrator violated Bulletin 111–3 in failing to advise plaintiff and the two other suppliers wherein their contract proposals were unreasonable in any respect about which they could legally contract.

**8.**

"Plaintiff made a prima facie showing, not rebutted by defendants, that the proposed wholesale supply contracts of plaintiff and other private suppliers were reasonable with respect to price of power, term of contract, adequacy and dependability of power supply and responsibility to deliver power; and, in fact, that the price of power, term of contract and adequacy and dependability of power supply under their proposals were considerably more favorable to the cooperatives than the contracts which they would probably be required to enter into with Louisiana Electric Cooperative, Inc.

**9.**

"Louisiana Electric Cooperative, Inc., upon consummation of the loan, would serve customers already being served by plaintiff and the generation and transmission facilities to be constructed by Louisiana Electric Cooperative, Inc. would duplicate facilities owned by plaintiff valued at approximately $5,000,000.00 and dedicated to providing service to its cooperative customers. The defendants have not required that Louisiana Electric Cooperative, Inc. obtain any certificate of public convenience and necessity from the Louisiana Public Service Commission. A show cause petition directed to that cooperative and involving this issue is presently pending before the Louisiana Public Service Commission.

**10.**

"Plaintiff made a prima facie showing that the construction of facilities with

the loan funds would result in higher electrical rates for the cooperatives; a less dependable power supply than presently available; power supply contracts with less favorable terms than existing and proposed contracts with private power suppliers; and that there was no justification therefor within the intent and purposes of the Rural Electrification Act. Plaintiff alleges and on the basis of evidence adduced has made a prima facie showing that the construction of facilities under the proposed loan will cause plaintiff and the other utility companies to be excluded from a substantial segment of the wholesale power business within the State of Louisiana for a lengthy period of time and that this was the true purpose behind the approval of the loan.

### 11.

"Plaintiff has made a prima facie showing that defendants conspired with the cooperatives to deprive plaintiff of its business, to substantially lessen if not completely destroy competition in the wholesale power business in the State of Louisiana, and without justification, to promote ownership of electrical utilities by cooperatives rather than by privately-owned electrical companies, and were motivated by a desire to cause injury or financial loss to plaintiff.

### 12.

"If plaintiff is denied an injunction at this time, it is likely that during the course of the litigation the loan may be consummated and construction may be begun on the generation and transmission facilities. Such action during the pendency of this proceeding would have an adverse effect on the public interest. It would be more convenient for all parties hereto to have the legality of the loan determined before its final consummation and before construction is begun. Plaintiff would suffer irreparable harm with the consummation of the loan, and defendants will suffer no injury or harm if the *status quo* is maintained through the issuance of an injunction."