**GTE INTERNATIONAL INCORPORATED,**
Plaintiff,

v.

**Harold V. HUNTER, Administrator of the Rural Electrification Administration and Eng. Hiram H. Puig, General Manager of the Puerto Rico Communications Authority, Defendants,**

**Stromberg-Carlson,**
Intervenor-Defendant.

Civ. No. 86–0459 (JP).

United States District Court,
D. Puerto Rico.

May 8, 1986.

Arturo J. Garcia, McConnell, Valdes, Kelley, Sifre, Griggs & Ruiz-Suria, Hato Rey, P.R., and Paul Fuener, Pettit & Martin, Washington, D.C., for plaintiff.

Enrique Lamoutte and Eduardo Toro Font, Asst. U.S. Attys., U.S. Atty's. Office, Hato Rey, P.R., for Hunter.

Teresita Picó, Old San Juan, P.R., for Puig.

Lisa B. Horowitz, Washington, D.C., and Arturo Díaz, San Juan, P.R., for intervenor.

## OPINION AND ORDER

PIERAS, District Judge.

This is an action brought by GTE International, Inc., seeking relief from the action of the Rural Electrification Administration (REA) directing the Puerto Rico Communications Authority (PRCA) to reject GTE's proposal on PRCA's competitive Bid No. 86–01–15–12 for a project of the Puerto Rico agency to be funded by a loan to be provided by REA to PRCA. Plaintiff has requested the Court to declare the agency's action invalid and to enjoin the defendants from awarding and funding a contract pursuant to the bid to anyone other than plaintiff or, in the alternative, to direct the PRCA to award the contract to plaintiff. Plaintiff claims the decision of the REA, and in particular its Administrator, Harold Hunter, in refusing to fund the PRCA's award to plaintiff is arbitrary and capricious, and beyond the scope of his authority. Plaintiff also claims that the intent of PRCA, and in particular Mr. Puig, General Manager of the PRCA, to vacate its previous award to GTE and to reaward the contract to Stromberg-Carlson is likewise arbitrary and capricious, and beyond the scope of his authority.

On April 4, 1986, after a hearing before plaintiff and the Federal defendant, the Court issued a temporary restraining order, enjoining the defendants from awarding and funding the contract at issue here. On April 11, 1986, Stromberg-Carlson was granted leave to intervene. Pursuant to Federal Rules of Civil Procedure Rule 65(a)(2) and with the consent of the parties, the Court ordered the trial of this action on

the merits to be advanced and consolidated with the Hearing on the Preliminary Injunction requested by plaintiff. Trial was held April 14, 15 and 16. On April 17, 1986, the Court issued an order from the bench granting the injunctive relief requested subject to the limitation that no award of the contract was to be made to GTE until Judgment is entered pursuant to this Opinion and Order. The parties have filed plenary briefs on plaintiff's requests for relief, and the Federal defendant filed a Motion to Dismiss the morning of trial. On the basis of the evidence and testimony admitted at trial and the arguments of the parties, the Court makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

1. Plaintiff GTE International, Inc. is a Delaware corporation with its principal place of business in Stamford, Connecticut. GTE is formerly registered and qualified to do business in Puerto Rico.

2. Defendant Harold Hunter is the Administrator of the REA, a Federal agency established in 1936 pursuant to the Rural Electrification Act, 7 U.S.C. § 901 *et seq* (1980). The REA is authorized, *inter alia*, to make loans for the purpose of furnishing and improving telephone service in rural areas. 7 U.S.C. § 902.

3. Defendant Hiram H. Puig is General Manager of the PRCA, a Puerto Rican public agency established in 1942 pursuant to Law No. 212 for the purpose of developing and managing the communications systems for Puerto Rico. 27 L.P.R.A. § 291 *et seq* (1985).

4. Intervenor-defendant Stromberg-Carlson is a Delaware corporation with its principal place of business in Lake Mary, Florida. Stromberg-Carlson does business in Puerto Rico.

5. On October 29, 1985, the PRCA issued Bid No. 86-01-15-12 for central office telephone equipment for the exchanges of Aguas Buenas, Aibonito, Cayey, Cidra, Culebra, and Vieques.

6. The funds to procure the services and equipment pursuant to Bid No. 86-01-15-12 were to come from a Federal loan made by the REA to the PRCA.

7. Under Bid No. 86-01-15-12, bidders were required to submit separate figures for (1) a "base bid", (2) "Alternate 1", and (3) spare parts and maintenance. "Alternate 1" was an option for additional services and equipment which the PRCA could choose to exercise at the time of awarding the contract or could reject prior to that time. Under the Bid, the prices for spare parts and maintenance were not to be considered by the PRCA in evaluating the bids.

8. Bid No. 86-01-15-12 included REA Form 525 entitled "Notice and Instructions to Bidders" supplied by REA for PRCA's use. Paragraph 5 of REA Form 525 requires that each proposal be accompanied by a bid bond "in an amount equal to ten percent (10%) of the maximum bid price".

9. Paragraph 10 of REA Form 525 states that "the Owner [the PRCA in this case] reserves the right to waive minor irregularities or minor errors in any proposal, if it appears to the Owner that such irregularities or errors were made through inadvertence."

10. The REA regulations which apply to the procedures to be followed by the PRCA in this case are found in REA Bulletin 384-1, and in particular Paragraph V-A, "Competitive Bidding". Bulletin 384-1, Section V-A-3, states that the "Owner" (the PRCA) may waive minor bid irregularities and that, where such a waiver occurs in the lowest responsive bid which is not in excess of the amount established in the loan budget when at least three bids have been received, prior approval by REA of a contract award is not required.

11. The time and date set for the opening of Bid No. 86-01-15-12 was 2:00 p.m. on January 15, 1986.

12. Plaintiff GTE originally estimated that its maximum bid price for the procurement would not exceed $7,200,000.00. It obtained a bid bond in the amount of $800,-

000.00 to cover the requirement for 10 percent of the maximum bid price, believing that $800,000.00 would be adequate to cover any last minute changes in its bid price. At about 11:00 a.m. on January 15, 1986, plaintiff discovered an error in the prices making up its original estimate, and readjusted the bid upward accordingly. Ultimately, plaintiff timely submitted a bid totalling $8,514,955.00, consisting of a base bid price of $6,754,641.00, an alternate price of $1,331,505.00, and a price for spare parts and maintenance of $428,808.00. Plaintiff inadvertently failed to increase the amount of its bid bond and thus submitted a bid bond in the amount of $800,-000.00.[1]

13. Plaintiff submitted the lowest base bid. Stromberg-Carlson submitted the next lowest base bid in the amount of $6,814,404.00, approximately $60,000.00 higher than GTE's base bid. Stromberg-Carlson's total bid price was $7,591,889.00, consisting of the base bid price, an Alternate 1 price of $431,020.00 and a price for spares and maintenance of $346,465.00.

14. The Engineering Division of the PRCA rejected Alternate 1 from consideration and, subsequently, on January 15, 1986, Telecommunications Associates Caribbean, the consulting engineers hired by PRCA for the procurement at issue here, recommended that "the only cost to be considered in the awarding" of the bid was the base price.

15. On January 24, 1986, the Board of Awards of PRCA unanimously approved the award of the contract to plaintiff as the lowest bidder in the amount of $6,754,-915.00. In so awarding, the PRCA found that the bid bond of $800,000.00 fulfilled the 10% requirement considering GTE's base bid of $6,754,915.00. The total

amount of the contract to be awarded to plaintiff was $7,176,456.00, consisting of base bid, and spare parts and maintenance.[2]

16. On January 16, 1986 Stromberg-Carlson sent a letter to Mr. William Kelly, Director, Southeast Area Telephone, REA, asserting that Stromberg-Carlson had submitted the lowest bid and that plaintiff's bid bond was deficient.

17. On February 20, 1986, REA, through Mr. Kelly, advised the PRCA that plaintiff's bid was not acceptable because of the bid bond deficiency, and that Stromberg-Carlson should be awarded the contract.

18. Subsequent to Mr. Kelly's letter, by memorandum dated March 6, 1986 to the Board of Awards, Telecommunications Associates Caribbean recommended that the award of the contract be given to Stromberg-Carlson.

19. By letter dated March 11, 1986, plaintiff submitted a "position paper" to Mr. Kelly explaining why the PRCA's waiver of plaintiff's bid bond deficiency should stand. A copy of the position paper was sent to the PRCA also.

20. By letter dated March 28, 1986, the REA, through Mr. Kelly, issued a written response to plaintiff's position paper denying plaintiff's request that the REA allow the PRCA's waiver of plaintiff's bid bond deficiency to stand. The REA reiterated its determination as set forth in its letter to the PRCA directing the PRCA to award the contract to Stromberg-Carlson.

21. In a previous PRCA procurement in December 1979, bids were received from contractors including Stromberg-Carlson and GTE. The bid bond submitted by

---

1. Plaintiff argues that, based upon its base bid and Alternate 1, and because REA rules require the PRCA not to consider the bid prices for spare parts and maintenance in its evaluation of the bids, its bid bond was deficient by $8,614.60 or 1.07% of the 10% amount required. On the other hand, Stromberg-Carlson argues that, based upon the total price of all three figures, plaintiff's bid bond was deficient by $51,495.59 or 6.05% of the amount required. For reasons

apparent in Part II, *infra,* we find it unnecessary to determine the percentage of deficiency of plaintiff's bid bond but here affirm that plaintiff's bond was deficient by no more than 6.05% of the amount required.

2. The PRCA chose not to contract for spare parts for Aibonito SLC A and reduced the price of spare parts and maintenance accordingly.

Stromberg-Carlson in that bid was not signed by an authorized officer of Stromberg-Carlson nor accompanied by an appropriate power of attorney. In that situation, where Stromberg-Carlson was the lowest bidder, the REA insisted on awarding the contract to Stromberg-Carlson, stating that it would not approve award of the contract to any other bidder.

## II. CONCLUSIONS OF LAW

### A. *Jurisdiction to Review the Defendant's Actions*

The Federal defendant has argued strenuously that this Court has no subject matter jurisdiction over this action and that the agency action at issue here is not judicially reviewable. We disagree with defendant's arguments for the following reasons.

An action against a Federal agency or officer seeking review of allegedly-unauthorized agency action is deemed to arise under the laws of the United States for purposes of 28 U.S.C. § 1331 unless some other statute is interpreted as precluding such review. *Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977) (concluding that the Administrative Procedure Act does not confer an independent grant of jurisdiction); 4 K. Davis, *Administrative Law Treatise* § 23:3 (2d ed. 1983). Nor does the doctrine of sovereign immunity bar a suit to which the provisions of the Administrative Procedure Act (APA), and in particular 5 U.S.C.

§ 706(2), apply. *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859, 873–74 (D.C. Cir.1970); 14 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3655 (1985). Because this suit is against a Federal officer for review of allegedly-unauthorized action and is brought *inter alia* under the APA, we find subject matter jurisdiction to review this present action under 28 U.S.C. § 1331.[3]

The Federal defendant before us further contends that the agency's action in this case is not subject to judicial review; its argument apparently is based on the APA provision exempting from review "agency action ... committed to agency discretion by law." 5 U.S.C. § 701(a)(2) (1977). As support, the Government has cited three cases from the Fifth and Eighth Circuits: *Alabama Power Co. v. Alabama Electric Cooperative Inc., et al.,* 394 F.2d 672 (5th Cir.1968); *Rural Electrification Administration, et al. v. Northern States Power Co.,* 373 F.2d 686 (8th Cir.1967); *Rural Electrification Administration, et al. v. Central Louisiana Electric Co., Inc.,* 354 F.2d 859 (5th Cir.1966). All three cases deal with direct loan situations where REA's selection of a Borrower has prompted a local private or public power supplier to sue for injunction of the loan due to allegedly harmful increased competition. The Circuit Courts in those cases decided that (1) the plaintiffs before them had no standing,[4] and (2) REA loan decisions were

---

**3.** The Federal defendant raises further arguments asserting the nonjurisdictional nature of 28 U.S.C. § 1651 and 28 U.S.C. § 2201. Plaintiff rightly asserts that these statutes go to the issue of remedy and do not confer jurisdiction. *See Federal Trade Com. v. Dean Foods Co.,* 384 U.S. 597, 603–05, 86 S.Ct. 1738, 1742–43, 16 L.Ed.2d 802 (1966) (All Writs Act); *Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671–72, 70 S.Ct. 876, 878–79, 94 L.Ed. 1194 (1950) (Declaratory Judgment Act). Plaintiff has further asserted jurisdiction and remedy pursuant to 28 U.S.C. § 1361. We find resort to Section 1361 unnecessary in view of the Court's power to provide equitable relief exercised under Section 1331. *American School of Magnetic Healing v. McAnnulty,* 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90 (1902) (resort to equity powers to attack administrative action upheld where no statutory review available). For a discussion disfavoring

the continued use of the mandamus remedy in actions such as these, see 4 K. Davis, *Administrative Law Treatise* §§ 23:11–:14 (1983).

The Federal defendant also has alleged that this action is in the exclusive jurisdiction of the Court of Claims. Because plaintiff is seeking declaratory and injunctive relief, not damages, and because our jurisdiction is founded on Section 1331, we find no merit in the defendant's argument.

**4.** The plaintiff before us is a bidder in the position to be granted or denied a contract. *Cf. Rural Electrification Administration, et al. v. Central Louisiana Electric Co., Inc.,* 354 F.2d 859, 865 (1966). The parties before us have raised no challenges to plaintiff's standing. Thus, our rather lengthy analysis of these cases focuses only on the second prong of the courts' decisions.

not judicially reviewable. To reach the second conclusion, the Courts relied on the lack of provision for judicial review in the enabling act. *Northern States,* 373 F.2d at 700; *Central Louisiana,* 354 F.2d at 865. In addition, the Fifth Circuit pointed to Congressional Committee participation in fostering REA regulations, and to Congress' ultimate control over the purse-strings of REA's budget. *Central Louisiana,* 354 F.2d at 865. The courts also looked to the failure of Congress in 1962 and 1963 to report out of committee successive bills introduced to provide for judicial review of REA orders approving loans. *Northern States,* 373 F.2d at 700; *Alabama Power,* 394 F.2d at 674. However, the *Alabama Power* court carefully allowed room for a possible future decision favoring reviewability "if the Administrator went beyond the outer perimeter of the authority vested in him by the statute." *Alabama Power,* 394 F.2d at 675.

■ We find the conclusions of the Fifth and Eighth Circuits to be inapposite here. First, we have before us, not a REA decision as to whom and in what amount a direct loan should be made, but rather a REA decision as to which contractor the Borrower should select in the expenditure of the loan monies. Congress' hold on the purse-strings may suffice to require REA's detailed justification of its budget requests, thus controlling the agency's direct loan making. *See* 7 U.S.C. § 906 (1980). However, in an area other than loanmaking which Congress has delegated to the agency for its determination, 7 U.S.C. § 904 (1980) (loans shall be on such terms and conditions relating to the expenditure of the moneys loaned as the Administrator shall determine), we see no legitimate Article I means by which Congress can control

the agency's acts. *See INS v. Chadha,* 462 U.S. 919, 954–55, 103 S.Ct. 2764, 2785–86, 77 L.Ed.2d 317 (1983) (Congressional action withdrawing delegated authority must meet the bicameral and presentment requirements of Article I of the U.S. Constitution).

■ Secondly, the law provides a presumption favoring judicial review of administrative action unless some other statute is interpreted to preclude review. *Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980. The mere absence of a provision granting judicial review is insufficient. *Moore McCormack v. U.S.,* 413 F.2d 568, 188 Ct.Cl. 644 (1969). Rather, the specific intent of Congress to preclude review must be shown by clear and convincing evidence. *E.g., Block v. Community Nutrition Institute,* 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270, *on remand* 742 F.2d 1472 (1984). In the case before us, we can find no evidence of Congressional intent to preclude review of *this level* of REA's actions. Though we do not decide the issue of the judicial reviewability of the agency's loanmaking decisions, we believe that the evidence of legislative intent to preclude such review is far from clear and convincing. In a situation where the requirements of standing and a showing of unauthorized action were satisfied, a challenged loan-making decision of the REA should be reviewable as well.[5]

### B. *The Merits of Plaintiff's Claim*

■ Our standard upon judicial review of this agency action is limited to whether the agency acted without a discernible rational basis for its action. *Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 283 (D.C.Cir.1981). A presumption of validity operates in favor of the agency's

---

5. Judge Tamm of the D.C. Circuit aptly stated that " ... in an era when, as the 'fourth branch of government,' the administrative agencies may well have a more far-reaching effect on the daily lives of all citizens than do the combined actions of the executive, legislative and judicial branches, the necessity for a legal means of piercing the glittering carapace of agency determinations to insure that they do not conceal congressionally unauthorized action is obvious

... Courts are therefore confronted with the problem of insuring that the idealistic objectives of brave but congressionally unauthorized action, ostensibly undertaken pursuant to a 'public interest' provision, are legally bottomed upon something more than a Bourbon Monarch's 'L/Etat-c'est Moi.' " *Ballerina Pen Company v. Kunzig,* 433 F.2d 1204, 1208 (D.C.Cir. 1970), *cert. denied,* 401 U.S. 950, 91 S.Ct. 1186, 28 L.Ed.2d 234 (1971).

action, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971), and the Court must affirm a rationally-based agency decision even though, in the agency's position, it might have decided otherwise. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 290, 95 S.Ct. 438, 444, 42 L.Ed.2d 447 (1974).

In arguing that the agency's action before us was rational, defendants REA and Stromberg-Carlson point this Court to REA Form 525 supplying the instructions to bidders, which states that "each proposal must be accompanied by a bid bond ... in an amount equal to ten percent (10%) of the maximum bid price," and to the uncontested fact that GTE's bid bond was $800,-000.00–$51,495.00 short of the 10% of its total bid, that is, the total of the base bid, alternate and spares. The defendants have argued that such a deficiency in the bid bond was fatal to GTE's proposal and that the PRCA should have rejected the GTE proposal on that basis and awarded the bid to Stromberg-Carlson, the one with the second lowest price on the base bid. REA has argued strenuously that the agency's past practice reveals an absolute rule regarding the 10% amount—a rule which mandates the rejection of a bid if the bid bond is even a dollar short of 10% of the maximum bid price. Stromberg-Carlson has argued that even if no absolute rule renders GTE's bond fatal in this case, GTE's deficiency

was not *de minimus* for purposes of considering it a minor irregularity that could be waived.

These arguments of defendants, however, miss the central issues before us: those are, whether the REA, through its rules and regulations, delegated the authority to the PRCA to waive minor irregularities in the bid bond and, if so, whether the reversal of that delegation in the actions challenged here was without a rational basis.

The REA regulations [6] establishing its procedures with its Borrowers in their selection of contractors are not clearly articulated and few of the operative terms are defined. REA Bulletin 384–1 provides procedures for the Borrower to follow in purchasing and installing central office equipment, including the procedure of competitive bidding. In its outline for that procedure, and as stated in the Findings of Fact, the agency established that prior REA approval of the award of the contract is not required where (a) the award is made to the lowest responsive bidder, (b) a minimum of three bids are received, (c) the amount of the bid is not in excess of the amount in the loan budget, and (d) the bid contains no irregularities except minor ones which may be waived by the Owner (in this case, the PRCA).[7] Bulletin 384–1, Section V–A–3, Appendix A. The Bulletin then states that "[i]n such [no prior approval] cases, the Owner's engineer

---

**6.** Throughout the trial, all the parties referred to the agency documents presented as regulations, and appeared to treat them as properly-issued agency rules which were binding upon them. The Court recognizes the somewhat obfuscated distinction between legislative and interpretative rules, and has considered the weight of these documents accordingly. REA Bulletin 384–1 appears to be a legislative rule and was issued in compliance with the APA rulemaking requirements. 5 U.S.C. § 553 (1977); 42 Fed. Reg. 60, 114 (1977). As such, it bears the force of law as a rule issued pursuant to the agency's delegated authority. *Batterton v. Francis*, 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977). The Checklist discussed *infra* may be viewed as an interpretative rule exempt for the APA notice and comment procedure, 5 U.S.C. § 553(b)(A), and as such is binding upon the agency. *See Morton v. Ruiz*, 415 U.S. 199,

233–35, 94 S.Ct. 1055, 1073–74, 39 L.Ed.2d 270 (1974). REA Form 525 can be considered a contract document exempt from the rulemaking requirements under 5 U.S.C. § 553(a)(2); its effect likewise is binding upon the agency. *See generally, Krupp v. Fed. Housing Admin.*, 285 F.2d 833 (1st Cir.1961) (agency's prospectus and contract of sale binding on Government in the same way as private party in action for breach of warranty).

**7.** That the criteria (a)–(c) were met in this case are not in dispute. As stated in the Findings of Fact, and pursuant to Section G–1–i of the REA 1980 Checklist, *infra*, the PRCA Board of Awards in this case was directed to consider only the base bid in its decision; GTE's base bid was the lowest one submitted.

is to immediately send to REA a tabulation of the bid results for all Bidders by exchanges, the recommendation of the engineer, and a statement of the Owner ... concerning the award of the contract. *Prior receipt of this information by REA will allow prompt approval of the executed copies of the contract when they are received."* Section V–A–3 (emphasis supplied). The procedure outlined in the Bulletin for competitive bidding contemplates final submission to REA for written approval of the contract. Section V–A–7, –8.

REA Bulletin 384–1 is supplemented by a "Suggested Checklist" issued by the agency in 1980, and sent to all telephone borrowers and consulting engineers to use with Bulletin 384–1. The Checklist instructs the borrowers that, in formal bid openings, "minor irregularities may be waived." Section G–1–e. It further reiterates the four-part test for "no prior approval" cases as set forth in Bulletin 384–1.

The final agency document applicable to this review is REA Form 525: "Notice and Instructions to Bidders". As stated in the Findings of Fact, this form requires the bidder to put up a bid bond in the amount of 10% of the maximum bid price, Notice, Section 5, and further states that the "Owner [PRCA] reserves the right to waive minor irregularities or minor errors in any Proposal, if it appears to the Owner that such irregularities or errors were made through inadvertence. Any such irregularities or errors so waived must be corrected on the Proposal in which they occur prior to the execution of any Contract which may be awarded thereon." Notice, Section 10. The form further provides that the acceptance of the Proposal by the Owner shall not create a contract until the approval of the Administrator is obtained in writing. Article VI, Section 7.

Thus, Bulletin 384–1 and the Checklist give the Borrower the right to waive minor irregularities for purposes of awarding the contract, all without REA's prior approval. Section V–A–3 of the Bulletin appears to assure the Borrower of nearly-rubber-stamp approval in cases where no prior approval is mandated prior to contract award. Form 525 presents similar language in stating to the prospective bidder that the Owner reserves the right to waive minor irregularities or minor errors in any Proposal although confusion arises as to the manner of correcting such waived matter. However, taking this language together with that in the Bulletin, we find less merit in Intervenor's creative argument that the word "proposal" in Form 525 is something less than the total bid, and does not include the bid bond, than in plaintiff's argument that the bid referred to in the Bulletin and the Checklist includes the entire package.

Accordingly, we find by a preponderance of the evidence that the REA did in fact delegate the authority to waive minor irregularities in the bid bond to the borrower in situations where the first three aforementioned criteria are met. However, the Administrator retained the right of prior and final approval of the loan in situations where the first three criteria for "no prior approval" are not met. He also retained the right of final approval in situations where the Borrower abuses its discretion in exercising its delegated authority in "no prior approval" cases. Thus, we find that the PRCA was justified in exercising its right to waive GTE's bid bond deficiency without prior consultation.[8]

We further find that the Borrower did not abuse its discretion in waiving GTE's bid bond. Based on Bulletin 384–1, the

---

8. The PRCA's decision to consider a bid bond deficiency as a minor irregularity for purposes of its power to waive the same is defensible particularly in light of the 1979 incident stated in the Findings of Fact. There the record reveals that the agency, when consulted, advised one of its borrowers to waive as a minor irregularity an unauthorized signature on the bid bond of the then lowest bidder, Stromberg-Carlson. Such a defect jeopardized the *entire* amount of the bond put up in that case. In contrast, the bid bond in this case has a deficiency of arguably 6.05%. The 1980 Checklist instructs the Borrower to "[c]heck each bid for proper signatures, bonds, and exceptions." Absent mandatory language, we cannot interpret this language as overruling by implication the agency's 1979 decision.

Checklist and Form 525, and without adequate definition of "maximum bid price", "minor irregularity", or "minor error", the PRCA reasonably thought that it could determine that the deficiency in the bid bond was a minor irregularity, and that it could do so by computing 10% of the base bid price.[9] Following the 1980 Checklist, the Board based the award of its contract on GTE's base bid only, excluding the unaccepted alternate and spare parts and maintenance. The record is clear that GTE's bid bond surpassed the amount of 10% of the base bid price. It further appears that, in the event GTE failed to accept the award, the bond posted was sufficient to satisfy the forfeiture provision on REA Form 307, the Bid Bond itself. That provision requires the defaulting bidder to pay to the Owner "the difference ... between the amount specified in the bid and such larger amount for which the owner may in good faith contract with another party." *Cf. Kiewit Western Co.*, B–220084, 85–2 CPD ¶ 497 (1985) (commercial form bid bond which allowed only the difference between the nonperforming bid and the next lowest bid is insufficient to comply with standard form obligating surety to pay any cost of procuring work from another source). In this case, the difference between GTE's accepted base bid and the second lowest base bid, that of Stromberg-Carlson, was $59,763.00—an amount amply covered by GTE's bond.

We do not find today that PRCA's choice was necessarily the most rational, or the best; we find that it was a reasonable one under the circumstances and based on the available guidelines provided it by the REA. We could find equally that the "absolute rule" espoused *post facto* by the REA in its letter of February 20, 1986 to the PRCA is a rational rule. What we

cannot find rational is the action of the REA in delegating authority to waive minor irregularities to a Borrower and, then, when the Borrower has made a decision within the bounds of its discretion and acted upon it, capriciously withdrawing the authority delegated and stating that it thinks the Borrower should have done it differently, and must now redo it, even though the agency's directive was not theretofore mandated by any regulation or guideline. To uphold this type of agency action would be to allow the REA absolute discretion to issue differing opinions on an *ad hoc* basis, delegating authority and then retracting that delegation in order to dictate an outcome without basis in any previously articulated standard.

■ Once delegated by regulation, the authority delegated binds the delegator, who then can exercise only whatever authority has been retained in the manner provided. *Service v. Dulles*, 354 U.S. 363, 385–86, 77 S.Ct. 1152, 1163–64, 1 L.Ed.2d 1403 (1957) (Secretary bound by decisions of Deputy Under Secretary in area in which authority delegated without retaining power of review); *accord U.S.A. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). Of course, the agency is free to change its regulations with the proper procedures if it wishes to do so. *Service v. Dulles*, 354 U.S. at 388, 77 S.Ct. at 1165.

The Government makes much of the argument that, by allowing the decision to waive the bid bond deficiency in this case, the Court will open a Pandora's box of horrors, chief among them a lack of review of the discretion exercised by the Borrower. We disagree. Following our decision, the REA is free to create clear rules and definitions to guide the Borrower's exercise

---

9. *See* note 8 *supra.* In addition, an argument raised by the PRCA in this regard spotlights the lack of definitions and inconsistent terminology used by the agency in this area of delegated authority. The evidence shows that, in a 1983 bid opening involving the Central Louisiana Telephone Company, one of the bids was rejected by the Borrower after the consulting engineer found that the contractor had not submitted a bid bond equal to 10% of the *base bid.* The "base bid" in that opening may have had a different meaning, as counsel for the Federal defendant has argued, since the "Alternate 1" used there was not to be added to the base bid. What we point out here is the lack of consistent defined terminology for the purpose of determining the requirements for a proper bid bond.

of discretion, to further define procedures for its review of all decisions prior to contract award, or to exclude in clear language the Borrower's authority to waive minor irregularities altogether. The true horror to be kept tightly sealed inside the mythical box is that of allowing the agency unbridled discretion to reverse delegations of authority and state guidelines *post facto*, all without judicial review to check any arbitrary acts of this so-called fourth branch of Government.

The institution of the public bid bears the healthy purpose of creating a mechanism which avoids subjective and arbitrary decision-making by bureaucrats entrusted with managing the monies of the people. Thus, the system, when properly functioning, purges itself of such vices as fraud or cronyism which operate at the expense of the taxpayer. The final products of such a system are greater efficiency and better quality.

Our ruling here in no way reflects adversely on any of the public officials involved in this case as the evidence indicates that all have acted in accordance with their best judgment. Rather, because of the foregoing underlying policy reasons which help to assure the permanence of our democratic system, the Court must safeguard the public interest by ensuring that the public bidding mechanism operates by pre-determined rules and regulations rather than outside insights and answers.

III. RELIEF

Based upon the foregoing findings of fact and conclusions of law, the Court DENIES the Federal defendant's Motion to Dismiss, and hereby DECLARES the action of the REA and, in particular defendant Hunter as Administrator of the REA, in refusing to allow the PRCA to waive the plaintiff's bid bond deficiency to be arbitrary and capricious, unlawful, and void of any legal effect. The Court further DECLARES that, to the extent that the PRCA and in particular defendant Puig as General Manager of the PRCA intend to award the contract to Stromberg-Carlson, their in-

tent is based on the REA's unlawful action and is therefore likewise arbitrary and capricious.

It appearing to the Court that plaintiff will suffer irreparable harm by being denied the opportunity to perform this contract to which it is entitled, the Court orders relief in the form of a permanent injunction as follows:

1. Mr. Hunter, Administrator of the Rural Electrification Administration (REA), acting individually or through his employees, officers or agents, and others acting in concert or participation with or for him, are hereby ENJOINED from withholding approval and funding of the contract to be awarded to GTE pursuant to Bid No. 86–01–15–12.

2. Mr. Puig, General Manager of the Puerto Rico Communications Authority (PRCA), acting individually or through his employees, officers or agents, and other acting in concert or participation with or for him, are hereby ENJOINED from withholding the award and execution of the contract pursuant to Bid No. 86–01–15–12 to the plaintiff GTE.

This Order is enforceable under penalty of contempt of Court. The portion of our Order issued April 17, 1986 restraining the award of the contract to GTE until entry of Judgment is DISSOLVED as of the date Judgment is entered pursuant to this Opinion and Order.

The Clerk shall serve a copy of this Opinion and Order upon counsel for the defendants, and such service shall be deemed service upon the defendants and all its officers, employees, attorneys and agents.

IT IS SO ORDERED.